With the Court's permission, I'd like to reserve two minutes for rebuttal following the government's presentation. Recognizing that the Court has the benefit of the briefing and a record before it, I'd like to focus on two of the points on appeal which the appellant submits requires reversal and remand of her case for a new trial. I'd like to first address the District Court's exclusion of the appellant's expert who was prepared to testify that, based upon his analysis, she did not profit or gain from the sale or brokering of drugs. The District Court's exclusion of this evidence based upon a discovery violation eviscerated a central element of the appellant's defense in this matter, thereby violating her due process and Sixth Amendment right to present a defense. What element would it be a defense to? A central element of the prosecution's case against the appellant was that her lifestyle, she could not have afforded or had the lifestyle that she did were it not for profits from drug transactions and thus encouraged that one could then infer that she was in fact involved in the sale or brokering of drugs. Her expert was prepared to testify based on his analysis and review of available documentation and interviews that, in fact, this was not the case, that she did not profit or gain from drug transactions. I suppose it's not a – if you sell drugs at a loss, it still violates – you're violating every element of the offense, I suppose. It seems to me it's just evidence that you wanted to use to – evidence the government was introducing. Yes, Your Honor, but – Just fair enough. I mean, I understand your argument. Yes, Your Honor, we would submit, however, that this – the exclusion of her expert in this regard did, in fact, eliminate her ability to present a defense to a central element of the government's case based on inferences and suggestions that she must be involved in this transaction based upon the lifestyle that she was allegedly living. Her expert was prepared to testify to the contrary. Based upon an inadvertent discovery violation, her expert was excluded from testifying. That really is the question. Was it an inadvertent discovery violation, or was it a tactical decision to want to wait and see what the government had, even though you have the documents, or they have the documents? And I'm not quite sure why it would be called inadvertent, but maybe you could enlighten us on that. Yes, Your Honor, and the government has urged that, in fact, there were grounds that existed whereby the district court could have found that the violation was willful. However, the district court did not find the violation to be willful, and, in fact, no evidence was taken or submitted that counsel did seek to gain a tactical advantage. In fact, the existence of and the general subject matter of the expert's proper testimony was disclosed to the government. The violation was in failing to provide reciprocal discovery in the form of the expert's report to the government prior to testimony. But, in fact, there was no finding that this was a willful violation, nor was there evidence submitted that there was any tactical advantage to gain. And on that point, I would submit to the court that wholesale exclusion was disproportionate to the discovery violation that, in fact, did occur. Other options were available to the district court, including to the extent that minimal prejudice had inured to the prosecution to allow them an opportunity to review the report, to allow them time to prepare, or the district court could have limited the appellant's expert's testimony to what would be a fair rebuttal of the government's presentation of evidence. But to exclude wholesale was disproportionate, and we would submit beyond the pale of reasonable justification under the circumstances establishing a clear abuse of discretion in this respect. I would submit also that to the extent that this was an inadvertent violation by counsel to impose such an extreme sanction on the defendant, in fact, punish the defendant for counsel's error when, in fact, a fine could have been imposed, sanctions could have been imposed on counsel. And, as pointed out in the briefing, there were other options available to the government to cure any minimal prejudice that may have inured to the prosecution. And I would just submit that with respect to the exclusion and the failure to allow her to present her expert was highly prejudicial in this respect, was not harmless error, given that a central aspect of the government's case was that her lifestyle could not be exclaimed by her reported income, and, therefore, it could be inferred by this that then she was, therefore, involved in this DTO conspiracy. The report was proper, so we know what was in it. Was it just evidence that her lifestyle was not as high or that she had an income that exclaimed it? A combination of both, Your Honor. That this was that, A, she was not living the lifestyle that the government would suggest that she was, and that there were other sources of income not, you know, or essentially the basis of the report, the basis of the expert's testimony was to rebut the government's suggestion that it could be inferred that she was involved in a drug trafficking organization conspiracy based on her supposed lifestyle. And in conclusion, with respect to this point, we would submit that the report and testimony would have, in fact, allowed her to reflect this evidence, and the lack of her ability to present a defense in this regard was inherently prejudicial and requiring a reversal and remand for any trial the opportunity to present a full defense, including to this aspect of the government's case. I'd also. Oh, go ahead. There was a pause. I thought you were going to. You were through, but go ahead. Well, I was going to move on to another point, unless Your Honor has a question. No. The District Court's denial of defendant's motion to suppress a statement that she made subsequent to her Miranda invocation. As reflected in the record before the court, the appellant was awakened before 6 a.m., found her house to be surrounded by armed police officers. These officers were supported by a helicopter, a K-9 unit. She was ordered from her home at gunpoint, placed under arrest, while her husband and two young children remained inside the house. After being taken into custody, she was questioned by two agents, one of whom was acting as a translator as Mrs. Boyle-Dion speaks only limited English. She was, through an interpreter or translator, the agent that was translating, given her Miranda warnings. She did invoke her right to counsel. Subsequently, then, the English-speaking agent, Agent Payne, did leave her in the company of Agent Fernandez, who was the Spanish-speaking agent, who continued to ask her questions despite her request for counsel. And as is reflected in the record, she was questioned, and the statements that were elicited were subsequently suppressed by the District Court. Shortly thereafter, while still in the company of Agent Fernandez, the appellant made a statement to the effect of, don't take my husband, he's a good man, he's not involved in this. And then, following the District Court's denial of her motion to suppress the statement, obviously it was admitted as evidence of her knowledge and involvement in the conspiracy, which, again, directly implicated her argument for acquittal. We would submit that the District Court's failure to suppress the statement is legal error requiring reversal, based upon the fact that the totality of the circumstances here demonstrate that she was in the midst of an extremely coercive atmosphere. Subsequent to her invocation of her Miranda rights, a Spanish-speaking agent was assigned to stay with her, in fact, continue to speak to her in a friendly manner, continue to ask her questions, responses which were then suppressed by the District Court. Her subsequent statement was a product of both this coercive atmosphere and a delayed product of the prior police coercion and improper interrogation. We would submit to the Court that her statement should have been suppressed. It directly impacted her defense and was undoubtedly relied upon by the jury to draw inferences regarding her mental state necessary to reach a guilty verdict. Her statement was made in the context of a highly coercive atmosphere, followed questioning subsequent to her invocation that was suppressed, and we would submit that the District Court's failure to suppress this statement was legal error that cannot be found to be harmless. You said that her statement that was admitted as a spontaneous statement came after she was questioned by the Spanish-speaking agent. That's correct. Is that right? I couldn't get that clearly from the magistrate's report. That's correct, Your Honor, and it isn't clearly in the magistrate's report. However, both I believe in the government's brief as well as in our briefing, it is established that subsequent to her invocation, the Spanish-speaking agent did in fact ask additional questions. The responses to those questions were in fact suppressed in a separate suppression motion from the suppression motion. I understood that. I just didn't realize that those questions and those answers that were suppressed came before and not after the spontaneous statement that was admitted. That's correct, Your Honor. Thank you. Good morning. May it please the Court. I'm Mark Rosenbaum. I'm the Assistant United States Attorney. I am representing the government, obviously, in the case of the United States. Pronunciation is a little difficult. It's boyazan, as I'm led to believe. I'd like to deal first with the question of the expert witness. This is a perfect case to suggest to us why there are supposedly two sides to every story, and this is quite different. I want to emphasize that the money aspect of this case was not nearly even close to a central element of the government's case. The government's case here revolved around a testimony of five co-conspirators, each of whom provided information concerning Ms. Boyazan's being the source of cocaine. We have Danny Kerr, the primary distributor in Alaska, Tatiana Stone, who was the principal courier during a large part of the conspiracy, Nicholas Lopeman, who came into the conspiracy later as trained by Lynn Everett and also had direct contact. Each of those individuals had direct face-to-face contact, engaged in hand-to-hand transactions with Ms. Boyazan. On top of that, we have over five kilograms of cocaine, which were seized from Ms. Boyazan's house on June 7th of the year 2000. Four kilos were found in her garage, secreted in a hidden compartment, and the other little over half a kilo was found in her bedroom armoire. Also in her bedroom was a heat sealer, a metal detector wand used, according to the evidence, to make sure the packages wouldn't trip off the metal detectors at the airport. And this is the central portion of the government's case. The question that we have in our brief is what was this accountant supposedly rebutting? There was no evidence introduced by the government to suggest that Ms. Boyazan was living a lifestyle inconsistent with her income. What we did do was introduce evidence of over $100,000 worth of wire transfers that Ms. Boyazan was either the payor or the payee, and the amount of the Western Union transfers was simply compared to her tax returns for the two years in question. That is what the defense is attempting to rebut with the opinion of someone, I would submit, is tendering an opinion well, well, well, beyond any evidence that the government introduced. The only evidence that the government introduced were, in fact, the records that were subpoenaed from Western Union and the tax returns that were obtained by court order. Beyond that, Ms. Mortua testified to nothing but addition and subtraction. She provided no opinion. She opined at no conclusion. She simply took the numbers that came from the records, put them in a spreadsheet, and acted as a summary witness to present that to the jury. And from that evidence, the government simply argued that people do not engage in $100,000 worth of wire fund transactions and not be involved in some sort of nefarious business. The guts of the case was in the testimony, as I indicated, of Danny Kerr, Tatiana Stone, Nicholas Loatman, and Mr. House, another drug courier. All of these records and what Ms. Mortua introduced really amounts to nothing but corroboration of the testimony of the five principal co-conspirators who did testify. At best, the proposed accountant's testimony would offer an alternative explanation but wouldn't even operate to negate the corroboration that was provided by the wire transfer records. In sum, the accountant would have added nothing. With respect to the question of suppression, there is an interesting question that was posed, or an interesting inference left, if you will, by the argument of Deep Mellon. She mentioned that Mr. Fernandez, Officer Fernandez, asked some additional questions. I think it's important for us to consider the nature of those questions. Officer Fernandez asked Ms. Boyazon whether there was anything in the house that was going to be dangerous to the dog who was about to be sent in to do a canine search. There were, in effect, no questions asked that were of an incriminating nature or sought to get incriminating information. The questions went strictly to the animal's safety, and I find it ironic to suggest that the questions which were intended to protect the dog are now sought to be used as fruit of the poisonous tree, so to speak, to the subsequent statement which is made after, and I think the defense has conceded this, after the officers ceased any questioning. In fact, they were getting ready to take everybody somewhere else, and I think from the facts and the record, we can clearly see that Ms. Boyazon was being escorted by Officer Fernandez back to the house, and her husband was out on the lawn of the house where they were standing, and when she saw him, she made the statement that she did. It was, you know, her choice to make that, and again, there has to be an interrogation purpose before we're going to be thinking about punishing the government or the police with the drastic remedy of suppression. Someone has to do something wrong, and nobody did anything wrong here. To suggest that Officer Fernandez's attempt to protect the canine, it was such a horrible thing that this statement should be suppressed, would seem illogical given the circumstances, and the fact that there was a time break. Between the time that Fernandez asked the question, the time break is the canine goes and conducts the search. Then, after the search is essentially completed, the canine's done what it has to do, that's the point where Ms. Boyazon is brought back to the house, and the statement is made, which referred to when Judge Hemby. Other than that, I don't see anything here that suggests anything other than the obvious, and that is that the evidence built in the case was simply overwhelming. You've got five coven speakers testifying. They're corroborated by airline records, hotel records, Western Union transfer records, and a host of other circumstances, not to mention the things found in Ms. Boyazon's house that would make any of the claimed errors harmless under any set of circumstances. Unless the panel has any questions, I have no further questions. Thank you. Thank you. With respect to the exclusion of the appellant's expert, the government would urge that his testimony would have added nothing, and this was not a central aspect of their prosecution or presentation to the jury. However, we would submit that an alternative explanation of the evidence or an opportunity to reflect the evidence, whether that testimony would have added something, is for the jury to assess the weight and credibility of her proper expert, not for an after-the-fact determination by the government that this testimony would have added nothing. Certainly, the financial implications and inferences that the jury was asked to draw based upon the evidence that the government submitted was very central to the prosecution's case against the appellant in this respect, and the fact that her opportunity to rebut this evidence was wholesale excluded, we submit, was in fact an abuse of discretion, and many other options were available to the court short of the remedy that the court determined to effect in this respect. Most specifically, that the court's finding to exclude this expert was based upon the fact that the court found the government to have been prejudiced. This prejudice could have been cured short of a wholesale exclusion of the expert, and we submit that, in fact, that should have been the case, and a failure to do so is, in fact, an abuse of discretion and requires reversal. With respect to the district court's failure to exclude the appellant's statement, again, responses, there was continued interrogation subsequent to her invocation at her right to counsel by the Spanish-speaking agent. He continued to speak to her in a frenzied manner. He did ask questions. The responses to those questions, in fact, were found to have been incriminating and were, in fact, suppressed. Her statement with respect to her husband was made shortly thereafter and specifically made to Agent Fernandez, the agent that continued to question her after she had invoked her right to counsel. Again, in this respect, we submit that this, in fact, is error, not harmless error, requiring reversal and remand for a new trial. Well, thank you. And submit it. Go to the next item on the calendar. Go ahead. May it please the Court. Opposing counsel, my name is MJ Hayden. I'm with the Federal Public Defender's Office, and I represent Cornelius Tico. At this time, with the Court's permission, I would like to reserve one minute for rebuttal. Sure. Mr. Tico was convicted under 21 U.S.C. 841 with possession of cocaine with the intent to distribute. His conviction was based on the search of his luggage at the Fairbanks Airport. Mr. Tico filed a motion to suppress the evidence found in his luggage based on the premise that the action of the officers who conducted the search of his luggage, their actions exceeded the scope of his consent. This is the issue that I would like to address today. It's our position that Mr. Tico is entitled to a reversal of his conviction because the district court erred in denying his motion to suppress. In addition, I believe that the district court's finding that there was no damage as a result of the breaking of the double-sided tape that secured the outer and inner petitions in the luggage, that the breaking of that tape created no damage to the luggage. I believe that that finding is clearly erroneous. The actions taken by Officer Whitmire, who was the officer who searched the luggage, in both forcing his hand underneath the attached plastic wall of the luggage and then prying the same wall open to remove the heat-sealed package was beyond the scope of Mr. Tico's consent. The Supreme Court has set the standard for measuring the scope of a suspect's consent under the Fourth Amendment in the case of Florida v. Ameno. In that case, the court held that the standard is one of objective reasonableness. And in other words, what would the typical reasonable person have understood by the encounter between the law enforcement officer and the person giving the consent? I believe in this case, it's beyond objective reasonableness to conclude that Mr. Tico's consent for the officers to take a quick look into his luggage would include Officer Whitmire's actions of forcing his fingers behind an attached panel of the suitcase and that the damage caused by Whitmire's attempt to force his fingers behind this panel would clearly not be anticipated by anyone who was merely consenting for an officer to look inside his luggage. The court in Ameno held that, in that particular case, it was a vehicle search, and the court held that the defendant's consent to search the vehicle extended to the unfolding and looking inside of a paper bag that was located inside the vehicle. But at the same time, the court held that such consent would not extend to the breaking open of a locked briefcase that was found within the trunk of the vehicle. If they found a transparent bag of white powder, could they break that open? Break the bag open? Well, Your Honor, I believe if they found a transparent bag of white powder, that at that point, probable cause, if it was in a vehicle, probable cause would probably allow them to break open that bag. Well, I wonder, you see, it seems to me there might be a difference between opening a trunk of a car and finding a locked suitcase in it and opening a suitcase and finding a secret compartment in it. I would think it's more suspicious to find a secret compartment than it is just to find a locked article. Yes, I agree with the court in that respect. But at the same time, here, the government is not relying on probable cause, whether probable cause was established once they found the secret compartment. The proper action that the officers... It's the scope of the consent, I suppose. I suppose what the consent, the subjective intent of the person consenting is that you can search as long as you don't find anything incriminating. But that's not... We've got to take what the consent would seem to be for objectively reasonable people, I guess. Yes, Your Honor. I believe in the Jimeno case that the court established a spectrum where we have the unfolding of the paper bag on one hand and the locked suitcase on the other hand. And if we look at what the circuit courts have decided along that spectrum, we have to decide how this case fits in. And the government has cited many cases that have to do with the removal of plastic clips to gain access to door panels or the removal of screws to get into vents or wooden boxes or areas beneath carpeting or the opening of some lids to cans. And the difference is that this manner, this particular search, is the manner in which the officer gained access.  And there was no damage whatsoever done to the containers or to the items that were searched. I would direct the court's attention to the Ninth Circuit case of United States v. Gutierrez-Menderes at 965 F. 2nd, 800. And that case involved another vehicle search where the officers opened a locked panel in the vehicle. And once they gained access to the panel, they moved an unattached piece of cardboard inside and thus finding contraband. In that case, this court held that it's important to assess the manner  and finding in that particular case that the officer didn't pry open the panel. He didn't break open the panel, but he used a key. And in addition, he didn't force loose the cardboard. The cardboard was already loose, and he simply moved it back, not using any force to do so that that search was within the scope of the defendant's consent. But here, when Officer Widmeyer both forcibly pried open the panel to get his fingers underneath to feel the heat-sealed bags, and then, with the help of even another officer, forced open the panel to pull the heat-sealed bag out from underneath it, I believe that that exceeded Mr. Teika's scope because of the manner in which they accessed the panel. Let me ask you, I'm having, I mean, I think your analysis is right on in the sense that we're trying to figure out where on the spectrum. So we have the case you just mentioned where we were looking at the cardboard, and the court specifically said they didn't have to pry it open and didn't use force. Yes, Your Honor. So that really goes to the method of search, and I guess that's contrasted with where you can just feel, which I think the government says here you can feel it so it's more like a plain view feel. But then we have these other cases that say, for example, if you authorize somebody to search your trunk, they can search anything in there that they think reasonably might include contraband. How do you reconcile the cases that talk about the degree of force versus almost the blanket authorization of cases? Well, Your Honor, I don't believe that this was, for lack of a better term, a plain feel. Because I think if you look at the evidence and you assess what steps Officer Widmeyer had to take in order to get his hand up behind the panel, Officer Grimes testified. Officer Grimes was another officer on the scene that did not conduct the search, and he testified both at an initial appearance and at the suppression hearing on how difficult it was for Officer Widmeyer to get his fingers behind the panel. I think he said, and I quote, it's a type of double-sided tape that's bonded very, very hard. I mean, it was difficult to get apart. But once he got a piece of it, he could put his hand in. And then he said he had to engage in a forcible act before he could do the feeling of the alleged contraband. Yes, Your Honor, I believe that's what the testimony shows. And I think that that manner of gaining access to the compartment is beyond the scope of Mr. Teika's consent. And I believe I'm out of time, if there are no further questions. Thank you. May it please the Court, I'm Mark Rosenbaum, Assistant to the United States Attorney, appearing on behalf of the government. The first thing I'd like to clarify, if I may, is the timing of things, the description that counsel brings us on the method of the search sounds an awful lot like a description of the bag after it had been searched and when it was searched in the office at the airport and, in fact, was taken apart with the assistance of another officer. What's significant here is we're talking about still being out on the airport concourse where Officer Widemeyer is the person who is conducting the search of the bag pursuant to consent, and Officer Grimes, Sergeant Grimes, is standing there with the defendant talking to him. The witness that we have testifying here is Sergeant Grimes. He was not the person that conducted the search. Officer Widemeyer was. At the time the search was being conducted, Sergeant Grimes was having a conversation face-to-face with the defendant. What we have, I think, is a strong disagreement on the interpretation of the evidence of the case, and I think in that set of circumstances, given the factual deferences to the District Court, the standard being clearly erroneous, that we've got to give the District Court the benefit of the doubt, having seen and heard the witnesses who testified. Didn't he have to separate the tape to get in, even out there in the concourse? With all due respect, Judge, I don't read the record. Read it that way. At pages 95 and 96 of the transcript of Mr. Grimes' testimony, not Mr. Widemeyer's, removal of the first package did not damage the suitcase. He just felt under the side from the bottom, and what I read from this transcript is that the compartment was held by screws and tape on three sides, and that Officer Widemeyer was unable to get in from those three sides, and as he felt around the compartment, came to the point at the bottom where he was able to get his fingers where it was not secure, in the same fashion as it was on the other three sides, was able to get his fingers between the two walls and could feel that there was a plastic bag inside, and in that regard, I would suggest that we're talking about playing field for all practical purposes. Here we have an individual who comes to the airport in the middle of winter in Fairbanks with $40 in his pocket, no credit cards and no explanation in effect for why he's there. Can't even remember who his employer is and what kind of work that he does necessarily, and then when he's asked for permission, consent, not once, not twice, not three times, but ten different times during the course of this transaction, the officers ask him for permission to be doing whatever they intend on doing next. It was almost a step-by-step simple sign that says, may I do this, may I do that, and TICO was consulted at each different step of the way. When we get to the point, can we look in your bag, they're looking in the bag, and Wittemeyer can feel that there, without going any further, there's a secret compartment in there, and I would submit to the court that given the totality of the circumstances at this point, and what we've got is a tip that he's a drug courier, we've got the conversation to which I just alluded about all those evasive answers, and then we find a secret hidden compartment in his bag. I would submit to the court that we're getting on probable cause here to believe that there's some sort of contraband, some sort of contraband substance in that suitcase. It's at that point that Wittemeyer says, or he's asked, can we go in the secret compartment, and he basically says, go ahead and do whatever you want to do, is in effect his answer, and that is the consent that we're talking about, is go ahead and do whatever you want to do. The district court found, the Madison recommendation found, and the district court adopted, a finding that that consent was voluntarily given, as well as the earlier three or four consents, and in effect they asked permission to go in that secret compartment, and this critique basically said yes. What we find in the record is that no destructive search, and when I use the phrase destructive search, I'm talking about having to take the bag apart to find out what's in that secret compartment. It didn't take place until the defendant was already under arrest. They had already taken him to the office. They had already found the plastic bag in the compartment, and the search of the bag was incident to his arrest. It's interesting that the case that counsel relies upon, Duteros-Materos, actually is probably the best case for the government in this situation, where a person says, go ahead, get in my car, the officers take the key and open up the trunk and start searching for the things in the trunk. Factually, it really is, in a lot of ways, the most analogous to the type of consent that we have for Mr. Teek at the airport, and actually his third or fourth consent along the way. Unless the court has any questions, I think the one thing, if we can bear in mind here, is that this particular stop is pretty much classic for an airport encounter, where you start off with a little bit of information, and the information just keeps building and building and building and building, until you get to the point that this person isn't giving you a straight answer to any of my questions, and the next thing you know, bingo, he's got a hidden compartment in his bag. I think if we look at the fatality of the circumstances to the point that the hidden compartment is discovered, without even considering what the officer was able to feel inside, there is no question that the officers acted reasonably, and I think that's what the district court found, and I found the correct facts in coming to that conclusion. Unless the court has any questions. Was there any argument made that the defendant was under some coercion when he gave his consent to take a quick look into the bag? I don't believe that theory was, let's put it this way, and the district court clearly found the contrary as to more than one consent, both the initial consent when they first made contact, all the way through the consent on the search of the compartment. But if we were to break it up, I think we'd have to look a little differently, Judge Preterson, at the issue concerning the compartment, because by the time consent for the compartment was asked for, the compartment had already been discovered. So you're in a different situation in terms of what the officers had. But that claim was made, but as I said, not pressed below, and the district court did make specific findings to the contrary on the issue of coercion at every step along the way, and I think we're obliged to defer to those factual findings. Well, you're saying that by the time the officer reached the compartment, there was a probable cause? In the circumstances for this particular case, yes. Once that secret compartment was discovered, given the fatality, I believe the officers could have concluded easily, it was more likely than not that there was going to be contraband in that bag. And that's the standard. Was there a photograph in the record? I don't remember seeing one of the secret compartment. I have to defer to the transcript, but my best recollection of the suppression hearing is that there were photographs that were referred to, that were taken after the bag had been searched in the police office, in the airport, after the defendant was under arrest. Those are the only photographs, as far as I know. That show the secret compartment? I believe they do, but it's after the fact. Forgive me. Does the court have any additional questions? No. Thank you very much. I'd just like to make some quick clarifications. There's actually two points in which Mr. Tika argues that the officer's actions exceeded the scope of his consent. The first being when Officer Widmeyer put his hand up behind the secured panel of his suitcase. And the second being when Officer Widmeyer, before Mr. Tika was arrested, put his hand back behind the panel and pulled out the heat-sealed bags. The government now argues that once the secret compartment was discovered, that the officers had probable cause. But this argument was never made at the suppression hearing and does not appear in any of the briefs. The government has never argued that the removal of the heat-sealed bags was a probable cause search. Senator, you said a minute ago the question about the consent to put the hand behind that plastic frame or whatever it was. And then the consent to remove the plastic bag? They were two separate events, Your Honor. Officer Widmeyer placed his hand behind the panel, and I believe if you'll review the report and recommendation of the magistrate, which was later adopted by the district court, that they found that the act of putting his hand behind the panel involved the removal of the tape that secured the plastic to the outer part of the frame of the suitcase. And there are pictures of the suitcase so that the court can get a good idea of how the suitcase was constructed, and those are found at tab D in Mr. Tika's excerpt of record. And while it's true that those photographs were taken after Mr. Tika's arrest and after another compartment was removed from the bag, I think that the court can see from those photographs that the construction of the bag and how the heat seal packets were placed on either side of the suitcase between an outer and inner wall. And the court can determine from looking at those pictures just how much room there was for an officer to get his hand under that panel and how much room there was to pull out these packets that were between an inch and two inches, according to the record, and width from beneath that panel. It's our position that when the district court held that the dislodging of the double-sided tape that attached the outer and inner panels of the walls of the luggage, that the damage occurred to it was more akin to the unfolding of a paper bag than it was to the opening of a locked briefcase, that that was error. And assessing this case on the spectrum of cases that are the legacy of Jimeno, I believe that the prying away of this plastic panel from the framework of the bag is more akin and more intrusive and destructive than the removal of replaceable screws or clips or cases along that line. I think it falls in the spectrum. Can I ask one question? I just want to get the chronology straight. When the officer says to him, he's talking about the panel, the secret panel, he says, Do you want to explain to me or do you want me to pull out what's in there? And then Mr. Teka says you can do whatever you want. Before the officer asked him that question, has he broken the tape? Yes, Your Honor. All right. It's my understanding, and according to the record, that he broke the tape once he placed his hand behind the panel. And that conversation followed that event. All right. Thank you. Thank you.
judges: Pregerson, Canby, McKeown